# IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
## AT NASHVILLE
### Assigned on Briefs June 9, 2004

## STATE OF TENNESSEE v. LAWRENCE WARREN PIERCE

**Direct Appeal from the Criminal Court for Davidson County**
**No. 2002-B-803     Steve R. Dozier, Judge**

———————————

**No. M2003-01924-CCA-R3-CD - Filed November 9, 2004**

The defendant, Lawrence Warren Pierce, was indicted for aggravated kidnapping and rape, convicted of the lesser-included offenses of kidnapping and sexual battery, and sentenced as a Range II, multiple offender to nine years and three years, respectively, to be served consecutively. On appeal, he argues that the evidence is insufficient to support his convictions; the conviction for kidnapping violates his due process rights because it was incidental to the sexual battery offense; and the trial court erred in denying his motion to dismiss due to the State's destruction of evidence and in imposing excessive sentences to be served consecutively. Applying the subsequent decision of Blakely v. Washington, 542 U.S. __, 124 S. Ct. 2531 (2004), we reduce the defendant's sentence for kidnapping to eight years. In all other respects, the judgments of the trial court are affirmed.

**Tenn. R. App. P. 3 Appeal as of Right; Judgments of the Criminal Court Affirmed as Modified**

ALAN E. GLENN, J., delivered the opinion of the court, in which JERRY L. SMITH and JOE G. RILEY, JJ., joined.

Ross E. Alderman, District Public Defender; Jeffrey A. DeVasher, Assistant Public Defender (on appeal); and J. Michael Engle and Rebecca Warfield, Assistant Public Defenders (at trial), for the appellant, Lawrence Warren Pierce.

Paul G. Summers, Attorney General and Reporter; Michelle Chapman McIntire, Assistant Attorney General; Victor S. Johnson, III, District Attorney General; and Amy Eisenbeck and Ryan D. Brown, Assistant District Attorneys General, for the appellee, State of Tennessee.

# OPINION

## FACTS

The victim, P.K.,[1] testified that at about 6:30 p.m. on October 24, 2001, she went to Ivory's Bar located inside the Holiday Inn on Briley Parkway in Nashville. She saw the defendant, whom she recognized from a construction site where she had worked and from "another place that [she] hung out with a lot of [her] friends." At some point in the evening, an unidentified man sat down beside the victim and "kept bothering" her until the defendant "came over and . . . rescued" her. Subsequently, the defendant asked the victim for a ride home and she and the defendant left the bar between 10:00 and 10:30 p.m. and drove to a sports bar, where they stayed for thirty to forty-five minutes before leaving to pick up hamburgers at a Krystal's Restaurant. From Krystal's, the victim drove the defendant to his hotel room at the Days Inn, arriving at about 11:00 p.m. She parked her car, and she and the defendant were "laughing and cutting up" when the defendant playfully took her car keys and got out of the car. The victim followed him in order to retrieve her keys until they came to his hotel room, where he grabbed her arm and "threw" her inside his room. He told her that he wanted her, that "he was gonna [sic] get [her] any way he could, and he wasn't gonna [sic] let [her] leave." The victim testified as to the events that followed:

> When he shoved me, I think I landed on the bed at that point. I got back up, and I told him I wanted to leave. And he told me I wasn't gonna leave. I went for the door. That's when he grabbed my arm again.
>
> He grabbed me with one hand – one hand on my arm, pulling up; and then he grabbed me by the hair of my head. I had very long, blond hair at the time. That's when he started jerking me around and slamming me on the bed.
>
> . . . .
>
> I started screaming, and he proceeded to put his hand over my mouth. His hand was so big, and he's still got this one – he let go of my arm, but he's still got me by the hair of the head.
>
> He put his hand over my mouth, and I was – I couldn't breathe. I thought I was gonna [sic] die. And at that point I thought he wasn't gonna [sic] let me go. And he told me, if I screamed when . . . he took his hand off, he would put it back.

---

[1] It is the policy of this court to refer to victims of sexual offenses by their initials only.

So, I nodded my head that I wouldn't scream. I don't know anybody didn't hear me. I mean, I screamed loud; and nobody came.

. . . .

I took my clothes off, what he didn't jerk off. He threw me on the bed and laid down on top of me, and he wouldn't let me up.

. . . .

He told me that we were gonna [sic] have oral sex, whether I wanted it or not.

. . . .

I begged him to let me up, that I can't breathe, 'cause he's so big. He's putting pressure on my whole body, and he's still – he's trying to put his penis in my mouth; and I'm trying to fight with him.

The victim testified that the defendant then forced his penis into her mouth and "ejaculated inside" her mouth. He told her if she called the police he would kill her and told her to write down her cellular telephone number, saying, "[I]f you don't write down the right [number], I'm gonna kill you." She then wrote her number on the front of a telephone book, the defendant called the number, and her phone rang. Assuring the defendant that she would not call the police, the victim hurriedly dressed and left the room. She drove to a Ramada Inn where she knew some of the security officers, and an officer called 9-1-1 to report the assault. Metro police officers responded to the call and then drove the victim back to the Days Inn, where she showed them the defendant's room, and to a hospital where she was examined and evidence was collected.

Ed McQuiston, a security officer at the Ramada Inn, testified that when the victim arrived there, she was "crying, and she was real shaken, you know, real emotional" and told him she had been assaulted. He called 9-1-1, and the tape recording of that call was played for the jury.

Officer Matthew Filter of the Metro Police Department testified that he was dispatched to the Ramada Inn, arriving at approximately 12:30 a.m., and described the victim's condition when he first saw her:

She was extremely upset. She was . . . crying. She was physically shaking. She didn't wanna [sic] even talk to me at all.

Her – her clothes were – she wasn't even fully clothed. She had some of her clothes in the car, next to her. Her clothes were in

disarray and just, you know, not very neat at all. She was wearing a
– some kind of robe at the time.

The victim told Officer Filter that the defendant had forced her inside his hotel room at the Days Inn, ripped her clothes off, and told her that "she needed to do exactly what he said, or else he would hurt her." The victim said she struggled with the defendant but could not fight him off because he was much larger than her.[2] The victim said the defendant grabbed her hair and "forced her head down towards his genitalia and forced his penis into her mouth, and she was forced to perform oral sex . . . on him, at which point he ejaculated inside of her mouth and all over her face."

Officer Filter and another officer, accompanied by the victim, then went to the Days Inn to speak to the defendant. While the victim waited in the patrol car, the officers knocked on the defendant's hotel room for "a good five-to-seven minutes" before the defendant finally answered. When asked about the incident involving the victim, the defendant told the officers that "he had met this girl at a bar and they came back to his room, and that they . . . fooled around a little bit; and that she all of a sudden got mad at him for an unknown reason and left." The defendant denied that he had any type of sexual intercourse with the victim. The officers then advised the defendant that a report was being filed and that he should stay at the hotel "or some place where he could be easily located, because a detective would be following up on the case." Officer Filter said that although they advised the defendant of his Miranda rights, he was not arrested at that time.

Sandy Myers, a family nurse practitioner, testified that she performed a rape kit examination on the victim in the emergency room at General Hospital. She related the events of the assault, as told to her by the victim:

> It happened on October twenty-fourth, '0-one; and the time was before midnight, and the place, Days Inn on Briley Parkway, with someone she had seen around; needed ride to his motel room; went to eat and then took him home.
>
> He took her keys; thought he was kidding; following him to room; grabbed her left arm, pulled behind her back; grabbed her by hair; threw her on the bed; said, if didn't take clothes off, would kill her.
>
> She screamed; he put his hand over her mouth; felt she should cooperate, took clothes off, begged him to let her go.

---

[2]The victim testified that she was 5'1" and estimated the defendant's height at 6'3" or 6'4". In response to a question during his interview by the police, the defendant said he was 6'4" and weighed 232 pounds.

He took his pants off, held her down on bed, pushed her head
down – pushed her head between his legs, told her to do oral sex;
performed oral sex.

Myers said the victim told her that the defendant's penis penetrated her mouth and that he ejaculated on her face, near her mouth. She testified that she used a wood light[3] on the victim's clothes, and it showed several areas of fluorescence on her blouse. She also swabbed the victim's throat, mouth, and chest. On cross-examination, Myers acknowledged that, during her examination of the victim, she did not note any trauma to the victim's head, neck, face, mouth, chest, or back.

Willie Cepnio, a registered nurse since 1978, testified that he gave the specimens from the victim's rape kit to Detective Kent McAlister on October 25, 2001, at 10:17 a.m. At Detective McAlister's request, he also drew two tubes of blood from the defendant for DNA analysis.

Detective Kent McAlister of the Metro Police Department testified that he interviewed the defendant on October 25, 2001, and accompanied him to the hospital to give a blood sample for DNA testing. Nurse Cepnio gave McAlister the defendant's blood samples which were later sent to the Tennessee Bureau of Investigation ("TBI") lab for analysis. During his videotaped interview, which was played for the jury and made a part of the record on appeal, the defendant showed McAlister the business card of a woman from Pennsylvania who he had met in the bar at the Holiday Inn. McAlister wrote down the woman's name and telephone number on a notepad and called her the following week. The woman acknowledged that she had been in the bar that night and had given someone her business card, but she did not remember the defendant or the victim. McAlister subsequently destroyed the paper containing the woman's name and telephone number, explaining that it was his usual practice to destroy his notes after completing his reports. During the interview, the defendant also gave McAlister "a torn corner of a phone book, that had a first name and a phone number on it." McAlister acknowledged that he did not go to the defendant's room at the Days Inn to determine if the torn corner matched the telephone book in that room.

Mary Wilhoite of the Metro Police Department testified that she worked in the property room and was the custodian over rape kits. She explained the procedure that is followed when an officer submits evidence and the tracking system used to account for the evidence. She identified a bag containing the victim's jacket, skirt, and blouse and said that the bag was taken to the crime lab by Detective McAlister on January 29, 2002, and was returned to the property room on April 4, 2002. She also identified the victim's rape kit which came into the property room on October 31, 2001, and which she transported to the crime lab on December 11, 2001.

Agent Hunter Greene, a forensic scientist with the TBI Crime Laboratory Serology DNA Unit, testified that he tested the victim's face and chest swabs which revealed the presence of spermatozoa. Additionally, he tested the victim's clothing which revealed the presence of

---

[3]Myers defined a wood light as "kinda [sic] like an ultraviolet light, that will fluoresce when there're certain things, such as semen."

spermatozoa on her shirt. He compared the defendant's blood sample with the spermatozoa from the victim's face and chest swabs and shirt and determined that the DNA profile matched the defendant. According to Agent Greene, the "probability of another individual having the same profile exceeds the current world population."

The forty-three-year-old defendant testified that on October 24, 2001, at about 5:30 p.m., he took a taxi to the bar at the Holiday Inn. He had a conversation with a man and two women, one of whom gave him her business card, and saw the victim come in "around six-something." The man with whom the defendant had been speaking went over to the victim and talked to her a few minutes. The man and the victim then left to go eat dinner; however, the victim returned to the bar fifteen minutes later, explaining that the man would not keep his hands off her. The man then returned to the bar and started bothering the victim. The defendant explained, "I don't know what it was about, but he came in and I got up and walked over. When I did, [the victim] got up and said, 'Oh, thank you,' and 'thank you,' for what I don't know. I mean, I never seen [sic] him do anything[.]" The victim sat down beside the defendant, and he bought her a drink. Contrary to the victim's testimony, the defendant said he had never seen her at a construction site but had seen her at Dad's Place.

Subsequently, the defendant and the victim left the bar at the Holiday Inn to go to Dad's Place to dance. When they arrived at Dad's Place, "there was hardly anybody there," so they left to go to Rivalry's for a beer. They subsequently left Rivalry's and stopped for hamburgers and cigarettes before going to his hotel room to eat and watch television. The defendant denied taking the victim's car keys or touching her as they walked to his room. He unlocked the door to his room, and the victim went in first. They sat down on the bed and "started kissing and stuff." The victim told him that he did not have her telephone number and then wrote her number down on the telephone book. When they started kissing again, the defendant raised the victim's shirt up and touched her breasts, and the victim put her hand inside his pants "on [his] privates." The victim then masturbated the defendant until he ejaculated, after which she "got up, she pulled her top down, picked up her shoes, and walked out the door and slammed the door." According to the defendant, the victim was fully dressed except for her shoes when she left. He later called the victim and left a voice message on her cellular telephone, asking her if she wanted to see him the next day.

The defendant said he then went to sleep and was awakened by the police officers' banging on his door. The officers advised him of his rights, and he agreed to answer their questions. He told the officers that he and the victim had "fool[ed] around," and the officers told him to contact Detective McAlister the next day, which he did. After speaking to McAlister, the defendant went to the police department where McAlister informed him that he was not under arrest. The defendant told McAlister that he had "foreplay" with the victim but not sex. He gave McAlister the business card of the woman from the bar at the Holiday Inn so that McAlister could contact her because he "thought she'd have a lot of important things to say. She was – the whole time was at the bar." He also gave McAlister the victim's telephone number that she had written down and consented to give a blood sample for DNA analysis.

On cross-examination, the defendant acknowledged that when Detective McAlister asked him during his interview if he had "any kind of sex" with the victim, his answer was always "[n]o." The defendant then said that McAlister had only asked him about "[o]ral or vaginal" sex and had never said "any other kind."[4] The defendant denied raping the victim or holding her against her will.

## ANALYSIS

### I. Sufficiency of the Evidence

The defendant argues that the evidence is insufficient to support either of his convictions.

In considering this issue, we apply the familiar rule that where sufficiency of the convicting evidence is challenged, the relevant question of the reviewing court is "whether, after viewing the evidence in the light most favorable to the prosecution, *any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." Jackson v. Virginia, 443 U.S. 307, 319, 99 S. Ct. 2781, 2789, 61 L. Ed. 2d 560, 573 (1979); see also State v. Evans, 838 S.W.2d 185, 190-92 (Tenn. 1992); State v. Anderson, 835 S.W.2d 600, 604 (Tenn. Crim. App. 1992); Tenn. R. App. P. 13(e) ("Findings of guilt in criminal actions whether by the trial court or jury shall be set aside if the evidence is insufficient to support the findings by the trier of fact of guilt beyond a reasonable doubt."). All questions involving the credibility of witnesses, the weight and value to be given the evidence, and all factual issues are resolved by the trier of fact. See State v. Pappas, 754 S.W.2d 620, 623 (Tenn. Crim. App. 1987). "A guilty verdict by the jury, approved by the trial judge, accredits the testimony of the witnesses for the State and resolves all conflicts in favor of the theory of the State." State v. Grace, 493 S.W.2d 474, 476 (Tenn. 1973). Our supreme court stated the rationale for this rule:

> This well-settled rule rests on a sound foundation. The trial judge and the jury see the witnesses face to face, hear their testimony and observe their demeanor on the stand. Thus the trial judge and jury are the primary instrumentality of justice to determine the weight and credibility to be given to the testimony of witnesses. In the trial forum alone is there human atmosphere and the totality of the evidence cannot be reproduced with a written record in this Court.

Bolin v. State, 219 Tenn. 4, 11, 405 S.W.2d 768, 771 (1966) (citing Carroll v. State, 212 Tenn. 464, 370 S.W.2d 523 (1963)). A jury conviction removes the presumption of innocence with which a defendant is initially cloaked and replaces it with one of guilt, so that on appeal, a convicted defendant has the burden of demonstrating that the evidence is insufficient. See State v. Tuggle, 639 S.W.2d 913, 914 (Tenn. 1982). We now will consider the sufficiency of the evidence as to each of the defendant's convictions.

---

[4] During his interview, the defendant repeatedly denied having sex with the victim and told Detective McAlister that any DNA found on the victim's clothing would not match his.

## A.  Sexual Battery

The offense of sexual battery, the lesser offense of which the defendant was convicted, requires that the defendant engage in "unlawful sexual contact" where "[f]orce or coercion is used to accomplish the act."  Tenn. Code Ann. § 39-13-505.  The essential difference between sexual battery and rape, the charged offense, is that rape requires sexual penetration of the victim whereas sexual battery only requires sexual contact, defined to include "intentional touching of the victim's . . . intimate parts . . . if that intentional touching can be reasonably construed as being for the purpose of sexual gratification."  Compare Tenn. Code Ann. § 39-13-503 with Tenn. Code Ann. § 39-13-505; see Tenn. Code Ann. § 39-13-501(6).  The defendant relies on the medical report showing no signs of redness or bruising on the victim to argue that there is insufficient physical evidence to show the use of force or coercion and that the available physical evidence is, in fact, more consistent with there having been no use of force.  Furthermore, he asserts that neither he nor the victim acted as one normally would after a sexual battery had been committed.  These points, the defendant argues, should have occasioned a reasonable doubt in the mind of a rational trier of fact.

The statutory definition of "coercion" does not require that the defendant use violence but states, as the trial judge correctly repeated in his jury instructions:  "'Coercion' means threat of kidnapping, extortion, force or violence to be performed immediately or in the future[.]"  Tenn. Code Ann. § 39-13-501(1).  Bearing in mind that it is the responsibility of the jury to assess the credibility of witnesses and resolve conflicts in testimony, we repeat the testimony of the victim at trial when asked if the defendant had threatened her:

> Q.  And was he making any more threats to you at this time?
>
> A.  He kill – told me he was gonna [sic] kill me, if I screamed or if I kept fighting.

Although the defendant correctly points out that the jury did not credit the entirety of the victim's testimony because they chose to convict him of the lesser offense of sexual battery, we note that a jury is free to reject or accept only parts of a witness's testimony.  See Byrge v. State, 575 S.W.2d 292, 295 (Tenn. Crim. App. 1978).  We conclude that a reasonable jury could have found, based upon the evidence, that the defendant committed a sexual battery on the victim.

## B.  Kidnapping

The defendant asserts that the evidence is insufficient to prove that he knowingly confined the victim so as to interfere with her liberty or that the victim was exposed to risk of serious bodily injury.  He argues that his hands were full when the victim said he grabbed her and forced her into the hotel room.  Furthermore, he notes that the victim's clothes showed no signs of being ripped, torn, or forcibly removed.

Both the defendant and the victim testified at trial that they stopped for hamburgers on the way back to the defendant's hotel room. While the victim did not testify as to who carried the hamburgers, the defendant claims that she held the hamburgers and her drink while he held his own drink and unlocked the door. The victim testified that when they came around the corner near the defendant's room, he "grabbed me by the arm" and "opened [the door] and threw me in."

The offense of kidnapping requires that the defendant knowingly "remove[] or confine[] another unlawfully so as to interfere substantially with the other's liberty . . . [u]nder circumstances exposing the other person to substantial risk of bodily injury." Tenn. Code Ann. §§ 39-13-302(a), -303(a)(1). False imprisonment (which is incorporated into kidnapping) requires unlawful removal or confinement, and "unlawful" means that the removal or confinement is accomplished by "force, threat, or fraud." Tenn. Code Ann. §§ 39-13-302, -301(2). While there was no evidence that the defendant used threat or fraud to effectuate the "removal" of the victim from the hallway into his hotel room, the victim testified that he grabbed her arm and forced her into the room. As to the argument that his hands were full at the time of the kidnapping, we note that the only testimony supporting this argument is that of the defendant. The victim did not testify in detail about who was holding the drinks and hamburgers when the pair reached the hotel room, nor was she cross-examined on this point. We conclude that the evidence was sufficient for a reasonable jury to find that the defendant kidnapped the victim.

## II. Kidnapping as an Incidental Offense

The defendant argues that the kidnapping offense was essentially incidental to the sexual battery offense and, therefore, violates his right to due process under the United States Constitution, Fifth and Fourteenth Amendments, and the Tennessee Constitution, Article I, § 8, 9.

In State v. Anthony, 817 S.W.2d 299 (Tenn. 1991), the defendants detained several restaurant employees outside and forced two more into the men's restroom while the defendants robbed the restaurant. The court explained that only a kidnapping that was not "incidental" to the main offense could be charged in addition to the accompanying felony:

> whether the confinement, movement, or detention is essentially incidental to the accompanying felony and is not, therefore, sufficient to support a separate conviction for kidnapping, or whether it is significant enough, in and of itself, to warrant independent prosecution and is, therefore, sufficient to support such a conviction. We further agree with the suggestion in State v. Rollins [605 S.W.2d 828 (Tenn. Crim. App. 1980)] that one method of resolving this question is to ask whether the defendant's conduct "substantially increased [the] risk of harm over and above that necessarily present in the crime of robbery itself."

Id. at 306 (quoting Rollins, 605 S.W.2d at 830).

-9-

The supreme court considered this question in State v. Dixon, 957 S.W.2d 532 (Tenn. 1997). In that case, the defendant grabbed his victim while she was walking down the sidewalk and "dragged her approximately thirty to forty feet from the illuminated sidewalk into or behind foliage growing on the back of an adjacent vacant lot," where he committed aggravated assault and attempted sexual battery. Id. at 533. The court crafted a two-part test refined from that in Anthony: "whether the movement or confinement was beyond that necessary to consummate the act of attempted sexual battery. If so, the next inquiry is whether the additional movement or confinement: (1) prevented the victim from summoning help; (2) lessened the defendant's risk of detection; or (3) created a significant danger or increased the victim's risk of harm." Id. at 535 (citing Anthony, 817 S.W.2d at 306). The court makes this determination as a matter of law. State v. Cozart, 54 S.W.3d 242, 248 (Tenn. 2001).

The defendant cites numerous cases establishing that merely binding a victim does not justify a separate conviction for kidnapping. See, e.g., State v. Blouvet, 965 S.W.2d 489 (Tenn. Crim. App. 1997) (defendant bound the feet of a store employee while he robbed the store); State v. Sanders, 842 S.W.2d 257 (Tenn. Crim. App. 1992) (defendant forced a restaurant manager, at gunpoint, into the restaurant and bound him while the defendant robbed the restaurant); State v. Raymond Griffin, No. W2001-01332-CCA-R3-CD, 2002 WL 1482689, at *8 (Tenn. Crim. App. Mar. 15, 2002), perm. to appeal denied (Tenn. July 15, 2002) (defendants bound the victim and robbed him in his house); State v. Kevin R. Mosley, No. 01C01-9108-CC-00235, 1992 WL 85799, at *3 (Tenn. Crim. App. Apr. 29, 1992) (binding of victims was "integral" to the robbery). Relying on these cases, the defendant argues that, because the degree of confinement in this case was less than if he had bound the victim, a separate kidnapping conviction cannot stand. However, we note that kidnapping requires removal *or* confinement. Tenn. Code Ann. §§ 39-13-302(a), -303(a). As we previously explained, there was sufficient evidence to support the jury's finding that the defendant knowingly forced the victim into his hotel room in a way that substantially interfered with her liberty and exposed her to substantial risk of bodily injury. Just as the supreme court reasoned in Dixon, 957 S.W.2d at 535-36, that the defendant in that case could have performed the sexual battery in the street as opposed to dragging his victim into the bushes, we presume that in the present appeal, the defendant could have committed the sexual battery offense outside of the hotel room or in the victim's car. Thus, the removal was not necessary to committing the sexual battery on the victim, but moving her into the hotel room lessened the risk of detection from passers-by in the hotel. Therefore, we conclude that the evidence supports a separate conviction for kidnapping.

## III. Destruction of Evidence

The defendant argues that the trial court erred in denying his motion to dismiss, based on the State's destruction of evidence, saying that Detective Kent McAlister, who interviewed the defendant the day after the incident, should not have destroyed his notes from that interview. During the interview, the defendant told Detective McAlister about a woman he had spoken to at the Holiday Inn bar who could testify as to the events in the bar that night, and McAlister copied the woman's name from a business card that she had given the defendant. McAlister testified that he called this woman, and she claimed not to remember either the defendant or the victim. As he testified was his

usual policy, Detective McAlister destroyed his notes after he finished the investigation report. There is no evidence in the record that the defendant himself attempted to contact this woman.

In denying the motion, the trial court stated:

> [I]n terms of what – using the Defense word, what "role" she might've played – and we've just discussed it further – I mean, the Defendant's statement is, "go interview her," that "she knows that I was there with [the victim]."
>
> Okay. We already know that. I mean, I just don't think, even if you assume . . . the State's actor, Detective McAl[]ister, should have retained this business card, that he gave back to the Defendant – assume he should've retained it, which I don't, then you get to the factors of does it play a substantial role in the trial preventing the Defendant from having a fundamentally fair trial.
>
> And that's what I'm trying to explain. I don't think there's any way that could be present, when you're talking about some, at the time, casual conversations at a bar that, according to [the victim], then two hours or plus later, result in an incident that she's described at the Defendant's motel room, not the Holiday Inn, where, even according to [the victim] and the Defendant, someone may've seen them there at – between six and seven, and this happened around eleven, twelve, or one, depending on the time frames of the various witnesses.
>
> So, it's even four-to-five hours, at best, later that – and [the victim's] acknowledged that she's agreed to go get something to eat, agreed to go take him home.
>
> And I just don't see, if that person was here – and I understand that you'd like to talk with her and not just accept Detective McAl[]ister's statement that she couldn't remember anything. Well, maybe she couldn't.
>
> But I . . . just don't think, under State versus Ferguson, that this type – if you wanna loosely label it – destroyed evidence – which it wasn't; it was given back to the Defendant and was, according to Detective McAl[]ister, followed up on.
>
> So, I'll overrule the motion.

The State does not have to preserve every single piece of evidence or information obtained during the course of a criminal investigation but must preserve evidence "subject to discovery and inspection under Tenn. R. Crim. P. 16, or other applicable law." State v. Ferguson, 2 S.W.3d 912, 917 (Tenn. 1999) (footnote omitted). Evidence that is not apparently significant or exculpatory need not be preserved:

> "Whatever duty the Constitution imposes on the States to preserve evidence, that duty must be limited to evidence that might be expected to play a significant role in the suspect's defense. To meet this standard of constitutional materiality, evidence must both possess an exculpatory value that was apparent before the evidence was destroyed, and be of such a nature that the defendant would be unable to obtain comparable evidence by other reasonably available means."

Id. (quoting California v. Trombetta, 467 U.S. 479, 488-89, 104 S. Ct. 2528, 2533-34, 81 L. Ed. 2d 413 (1984)). Previously, this court has held that "[t]he prosecution is not required to disclose information that the accused already possesses or is able to obtain." State v. Marshall, 845 S.W.2d 228, 233 (Tenn. Crim. App. 1992). If the State has failed in its duty, then the court must ascertain the effect of its failure, considering such factors as:

1. The degree of negligence involved;

2. The significance of the destroyed evidence, considered in light of the probative value and reliability of secondary or substitute evidence that remains available; and

3. The sufficiency of the other evidence used at trial to support the conviction.

Ferguson, 2 S.W.3d at 917 (footnote omitted). In this analysis, "the central objective is to protect the defendant's right to a fundamentally fair trial." Id.

Applying the first step of the Ferguson analysis, we conclude that the State had no duty to preserve the name of the witness because the defendant himself had possession of the evidence, namely, the woman's business card. Thus, the State had no duty to disclose the evidence and, therefore, no duty to preserve it. See id. at 918. The defendant argues that the evidence had exculpatory value because the witness could have testified about conversations at the Holiday Inn bar and, presumably, could have impeached the testimony of the victim in some way. However, when Detective McAlister discarded the contact information for the woman, he did so, by his testimony, with the belief, based on his own conversations with the witness, that the evidence had no exculpatory significance.

**IV. Sentencing**

-12-

The defendant argues that the trial court erred by imposing excessive sentences as to both convictions and in ordering that they be served consecutively.

When an accused challenges the length and manner of service of a sentence, it is the duty of this court to conduct a *de novo* review on the record with a presumption that "the determinations made by the court from which the appeal is taken are correct." Tenn. Code Ann. § 40-35-401(d). This presumption is "conditioned upon the affirmative showing in the record that the trial court considered the sentencing principles and all relevant facts and circumstances." State v. Ashby, 823 S.W.2d 166, 169 (Tenn. 1991). The presumption does not apply to the legal conclusions reached by the trial court in sentencing the accused or to the determinations made by the trial court which are predicated upon uncontroverted facts. State v. Butler, 900 S.W.2d 305, 311 (Tenn. Crim. App. 1994); State v. Smith, 891 S.W.2d 922, 929 (Tenn. Crim. App. 1994); State v. Bonestel, 871 S.W.2d 163, 166 (Tenn. Crim. App. 1993), overruled on other grounds by State v. Hooper, 29 S.W.3d 1, 9 (Tenn. 2000).

In conducting a *de novo* review of a sentence, this court must consider (a) any evidence received at the trial and/or sentencing hearing, (b) the presentence report, (c) the principles of sentencing, (d) the arguments of counsel relative to sentencing alternatives, (e) the nature and characteristics of the offense, (f) any mitigating or enhancement factors, (g) any statements made by the accused in his own behalf, and (h) the accused's potential or lack of potential for rehabilitation or treatment. Tenn. Code Ann. §§ 40-35-103, -210; State v. Taylor, 63 S.W.3d 400, 411 (Tenn. Crim. App. 2001).

The party challenging the sentence imposed by the trial court has the burden of establishing that the sentence is erroneous. Tenn. Code Ann. § 40-35-401, Sentencing Commission Cmts.; Ashby, 823 S.W.2d at 169. In this case, the defendant has the burden of illustrating the sentence imposed by the trial court is erroneous.

### A. Length of Sentences

At sentencing, the parties stipulated that the defendant was a Range II, multiple offender, making him subject to a sentence between six and ten years for the kidnapping conviction, a Class C felony, and a sentence between two and four years for the sexual battery conviction, a Class E felony. See Tenn. Code Ann. § 40-35-112(b)(3), (5). The trial court found no applicable mitigating factors but applied three enhancement factors:

> (2) The defendant has a previous history of criminal convictions or criminal behavior in addition to those necessary to establish the appropriate range;

> (8) The offense involved a victim and was committed to gratify the defendant's desire for pleasure or excitement; [and]

(9) The defendant has a previous history of unwillingness to comply with the conditions of a sentence involving release in the community[.]

Tenn. Code Ann. § 40-35-114(2), (8), (9) (2003). Based on these factors, the trial court imposed a sentence of nine years for the kidnapping conviction (applying factors (2), (8), and (9)) and three years for the sexual battery conviction (applying factors (2) and (9)).

According to the presentence report, the defendant had the following prior convictions:

| | | | |
|---|---|---|---|
| 1. | 1/11/02 | Assault 3rd – Family Violence[5] | 3 days |
| 2. | 5/27/98 | Threat to Injure – Telephone Trans. | 12 months, 36 months probation |
| 3. | 9/29/95 | DUI | 15 weekends, $450 fine, 12 months probation |
| 4. | 1/28/94 | Theft by Deception | 12 months probation |
| 5. | 4/20/93 | Theft by Conversion | 10 years probation |
| 6. | 11/15/92 | Giving False Name | 12 months probation |
| 7. | 11/15/92 | Terroristic Threats | 12 months probation |
| 8. | 11/15/92 | DUI | 12 months probation, $400 fine |
| 9. | 9/29/98 | Grand Larceny – 2 counts | Sentence Not Listed |
| 10. | 9/29/98 | Fraud – Credit Card | Sentence Not Listed |

Given the number of his prior convictions, the defendant concedes, on appeal, that enhancement factor (2) was properly applied to both of his convictions. We note that applying the holding of Blakely v. Washington, 542 U.S. __, 124 S. Ct. 2531 (2004), which was decided after the briefs were filed in this matter, would not alter the power of the trial court to utilize the defendant's prior convictions in increasing his sentence from the minimum. Id. at __, 124 S. Ct. at 2536 (citing Apprendi v. New Jersey, 530 U.S. 466, 490, 120 S. Ct. 2348, 147 L. Ed. 2d 435 (2000)) (prior conviction may be utilized by trial court for sentence enhancement without submission to a jury).

However, the defendant argues that the trial court erred in applying factor (8) to the kidnapping conviction and factor (9) to both convictions and failed to apply one mitigating factor: the defendant's employment history. Tenn. Code Ann. § 40-35-113(13) ("Any other factor consistent with the purposes of this chapter.").

As we will explain, the holding in Blakely benefits the defendant, for its application prevents the use of enhancement factors (8) and (9). First, we note Blakely held that "the State is free to seek judicial sentence enhancements so long as the defendant . . . stipulates to the relevant facts or consents to judicial factfinding." 542 U.S. at ___, 124 S. Ct. at 2541. However, we have carefully reviewed the transcript of the sentencing hearing and cannot conclude that the State sufficiently

---

[5] This information is listed in the "disposition" section of the presentence report while the "conviction offense" section is listed as "not defined."

proved that the defendant committed either these or other offenses while his earlier suspended sentence still was in effect. Although he admitted at the sentencing hearing as to those convictions which we have designated as numbers 2, 3, 4, 5, 7, and 9, and that he earlier had been placed on supervised probation, he did not admit that the probation had been for ten years, as the State asked that he do, or admit that the offenses which are the basis for the present appeal were committed while that probationary period still was in effect. In fact, he said that he "didn't believe" he was on probation at the time of the present offenses. Since the sentencing hearing occurred before the release of the Blakely opinion, the State could not have recognized at the time the need to establish by other means the period the defendant was on probation; the trial court, likewise, could not have foreseen that the proof was inadequate for application of factor (9). Similarly, as to enhancement factor (8), that the offense "involved a victim and was committed to gratify the defendant's desire for pleasure or excitement," we conclude that there is no proof, as required by Blakely, for its application.

As to the asserted mitigating factor, the essential facts are not in dispute. The defendant worked as a self-employed general contractor such that he, at times, had a great deal of work and at other times very little. While the State characterizes this history as "unpredictable," the defendant calls it "favorable." Although work history can be a relevant mitigating factor, as the disputed characterization of the defendant's work history reveals, the record contains little evidence as to the nature and reliability of the defendant's work such as "job performance, length of service, or his reasons for leaving any of these jobs." State v. Kelley, 34 S.W.3d 471, 483 (Tenn. Crim. App. 2000). Accordingly, we cannot conclude that the trial court erred in determining that the defendant's work history should not be applied as a mitigating factor. In fact, even if the trial court did err in this regard, it appears that his work history would be entitled to little weight and of little benefit, given his substantial record of convictions.

After application of Blakely, the only applicable sentencing factor is enhancement factor (2). While the defendant does have an extensive prior record, we cannot conclude that the trial court would have sentenced as it did, knowing that only one enhancement factor was applicable. As a Range II, multiple offender, the defendant's sentences for the kidnapping and sexual battery convictions were to be within the ranges of six to ten years and two to four years, respectively. His sentence for the kidnapping was nine years, one less than the maximum. We reduce this sentence to eight years. As to the sexual battery, the defendant's three-year sentence is the midpoint, and we do not believe that this sentence must be modified.

## B. Consecutive Sentencing

The trial court ordered that the defendant's sentences be served consecutively, based on "his extensive record and these offenses being committed while he's on probation." The defendant argues that his sentences should not run consecutively because the resulting twelve-year sentence is beyond that necessary to achieve the trial court's purpose and because the two convictions arose from a single criminal episode.

We first must determine whether the holding in <u>Blakely</u> affects the trial court's consecutive sentencing of the defendant. We note first that courts have interpreted the holding in <u>Apprendi v. New Jersey</u>, 530 U.S. 466, 120 S. Ct. 2348, 147 L. Ed. 2d 435 (2000), to allow the trial court to determine whether sentences should be served consecutively. <u>United States v. Samuel</u>, 296 F.3d 1169, 1175 (D.C. Cir. 2002) ("[T]he district court did not commit <u>Apprendi</u> error when it enhanced [the defendant's] sentence because he committed the second of his narcotics offenses while he was on release for the first."), <u>cert. denied</u>, 537 U.S. 1078, 123 S. Ct. 680, 154 L. Ed. 2d 578 (2002); <u>People v. Williamson</u> 747 N.E.2d 26, 34 (Ill. Ct. App. 2001) (trial court may consider "the nature and circumstances of the offense and the history and character of the defendant" in determining whether consecutive sentencing "is required to protect the public from further criminal conduct by the defendant, the basis for which the court shall set forth in the record"). Subsequently, our supreme court noted in <u>State v. Robinson</u>, __ S.W.3d __, 2004 WL 2158117, at *25 n.14 (Tenn. 2004), that "several courts" had rejected the claim that <u>Blakely</u> and <u>Apprendi</u> apply to a determination as to whether sentences should be served consecutively. We conclude that neither <u>Blakely</u> nor <u>Apprendi</u> affect the trial court's ordering that the sentences in this matter be served consecutively.

The trial court may impose consecutive sentences if, inter alia, "(2) [t]he defendant is an offender whose record of criminal activity is extensive; or (6) [t]he defendant is sentenced for an offense committed while on probation." Tenn. Code Ann. § 40-35-115(b)(2), (6). These criteria are stated in the alternative; thus, only one must exist for consecutive sentences to be proper.

We agree with the trial court that the -115(b)(2) criteria is satisfied. The defendant clearly had an extensive record of criminal activity according to the presentence report, including convictions for DUI, assault, making threats to injure, making terroristic threats, and several incidents of theft of various kinds (grand larceny, fraud, and others). Based on these prior convictions and the defendant's own admissions, we conclude that the trial court was within its discretion in ordering that the sentences be served consecutively. Because this court has held that "[e]xtensive criminal history alone will support consecutive sentencing," <u>State v. Adams</u>, 973 S.W.2d 224, 231 (Tenn. Crim. App. 1997), we do not need to address the trial court's application of -115(b)(6). The finding of an extensive criminal history is sufficient.

The defendant argues that the consecutive sentences were beyond that necessary to achieve their purpose or, equivalently, that they were not the lease severe measures necessary. In support of this contention, he cites <u>State v. Taylor</u>, 739 S.W.2d 227 (Tenn. 1987). However, the supreme court has since acknowledged that the sentencing statutes, in particular Tenn. Code Ann. § 40-35-115, regarding consecutive sentences have codified the holding in <u>Taylor</u>. <u>See</u> <u>State v. Wilkerson</u>, 905 S.W.2d 933, 936 (Tenn. 1995). Turning to the statute directly, we have already found the presence of -115(b)(2) which is sufficient in itself to support the court's decision to impose consecutive sentences.

The defendant also argues that the convictions arose from the same criminal episode. Even granting the defendant's argument that his convictions arose from the same intent, we decline to hold that consecutive sentences are inappropriate. In <u>State v. Desirey</u>, 909 S.W.2d 20, 34 (Tenn. Crim. App. 1995), we held that consecutive sentences were inappropriate because of "[t]he nonviolent

-16-

nature of the offenses, the circumstances connecting the offenses to each other, and the defendant's potential for rehabilitation." The facts of this case do not compel the same leniency. The defendant's potential for rehabilitation is doubtful given his criminal history, and the offense of kidnapping, even though extreme physical violence was not used, still exposed the victim to substantial risk of injury. Tenn. Code Ann. § 39-13-303(a)(1). Given these facts and the presence of the statutory criteria, we conclude that the trial court did not err in imposing consecutive sentences.

## CONCLUSION

Based upon the foregoing authorities and reasoning, we reduce the defendant's sentence for kidnapping to eight years but, in all other respects, affirm the judgments of the trial court.

ALAN E. GLENN, JUDGE